(51 South. 70.)

No. 17,662.

H. & C. NEWMAN, Limited, v. PELLERIN et al.

(Dec. 13, 1909. Rehearing Denied Jan. 17, 1910.)

*(Syllabus by the Court.)*

BILLS AND NOTES (§ 239*)—ACTIONS—DEFENSES—FRAUD.

Certain parties indorsed a negotiable promissory note upon the assurance made to them by the maker that it had been agreed between himself and the holder of the note that they would never be called upon to pay it. These assurances did not protect them from liability, as the holder had in fact made no such agreement as had been represented, but had made to the maker a promise to return the note to him on a condition which was not complied with.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. § 570; Dec. Dig. § 239.*]

Appeal from Nineteenth Judicial District Court, Parish of St. Martin; James Simon, Judge.

Action by H. & C. Newman, Limited, against Joseph Pellerin and others. Judgment for defendants, and plaintiff appeals. Reversed and rendered.

Martin & Martin, for appellant. Cammack & Broussard, for appellees.

### Statement of the Case.

NICHOLLS, J. The plaintiff alleged that the defendants are indebted to them in the sum of $2,500, with 8 per cent. per annum interest thereon from November 18, 1907, until paid, plus 10 per cent. on the aggregate amount thereof, for this, that it is the owner and holder for value of that certain promissory note made and subscribed to by Joseph Pellerin, of St. Martin parish, La., to his own order and by him indorsed in blank for the sum of $2,500, dated November 18, 1907, and falling due on January 1, 1909, and conditioned to bear interest at the rate of 8 per cent. from date until paid; the said note also embodying the agreement on the part of the makers and indorsers thereof waiving severally the pleas of discussion and division, presentment of payment, notice of nonpayment and protest, and the consent that the time of payment may be extended without notice thereof, and in the event of its nonpayment at maturity to pay all attorney's fees incurred in the collection of said note, or any portion thereof, including interest, which were therein fixed at 10 per cent. on the amount collected, which said note is hereto annexed for reference. Petitioner further avers that, upon its nonpayment at maturity,

the said note was duly protested and notices of nonpayment and protest mailed according to law to each of the defendants herein, which protest was made at a cost of $4.95.

Averring amicable demand, and that the same is past due and unpaid, petitioner prayed that the defendants be cited, and that there be judgment in favor of your petitioner and against defendants in solido ordering them to pay unto petitioner the sum of $2,500, with 8 per cent. yearly interest thereon from November 18, 1907, until paid, plus 10 per cent. on the aggregate amount of said principal and interest as attorney's fees, and plus the sum of $4.95, protest fees aforesaid, and for all costs of this suit to be taxed.

The indorsers of the note answered. They alleged they were merely accommodation indorsers on the note sued upon, and that they had subscribed their names to the said note under the following circumstances: They all knew that Joseph Pellerin, the maker, was doing business with the plaintiff corporation; that said Jos. Pellerin informed them that his merchants, plaintiff corporation, were greatly embarrassed and were in need of funds to save themselves from ruin and to tide the money crisis; that said Jos. Pellerin informed them that the above facts had been imparted to him, Jos. Pellerin, by member of plaintiff corporation, who had asked said Jos. Pellerin to secure five or more indorsers on each of two notes of $2,500 each, which notes were to be accommodation paper only, not for Jos. Pellerin's use and benefit, but for the use and benefit of plaintiff corporation, and that plaintiff corporation had guaranteed him, Jos. Pellerin, that they, the indorsers, respondents, should never be called upon by the plaintiff to pay part or portion of the amount represented by said notes, which were to be used merely to enable plaintiff corporation to borrow money during the crisis.

That believing that the note sued on was a mere accommodation for the use of plaintiff, with no responsibility attached towards plaintiff or said Jos. Pellerin, they did subscribe their names, but that they had received no benefit or consideration therefor, and that Jos. Pellerin had received none.

That their signatures were obtained by fraud, error, and deception, all of which they pleaded, and that, when they did sign said note, they did so on the representations of Jos. Pellerin, who stated to them that on the request of plaintiff, then needing his assistance to raise funds, their signatures to said note would in no wise bind them to the plaintiff for any amount, as said plaintiff needed the note to procure and raise funds for their (plaintiffs') own personal benefit, and requested said Jos. Pellerin to make that note and obtain the signatures of his friends to give greater value and negotiability to same, and that but for those representations they would not have affixed their signatures thereto.

Respondents pleaded, in the alternative, if there should be judgment adverse to them, being ordinary sureties, that judgment rendered against them should be joint each for his virile share.

Wherefore defendants prayed that their signatures on the note sued on be declared to have been affixed in error and by reason of fraud and deception practiced upon them, and consequently of no force and effect in law; and that plaintiff's action be dismissed and rejected with costs, and said note be decreed canceled and valueless, and in the alternative, and without in any manner admitting that the facts bear out the proposition if your honorable court should render adverse judgment, defendants in that event prayed that said judgment be against each for his virile share and for equitable and general relief.

Joseph Pellerin, the maker of the note sued on, answered.

He alleged: That he made and subscribed the note sued on at the request of the plaintiff, who represented to respondent that, owing to the financial conditions then existing, the plaintiff corporation was financially embarrassed and in great need of money to tide the existing money crisis and panic. That the plaintiff company, to whom he was, before the execution of the note sued on, indebted, claimed that respondent should assist the plaintiff to raise funds, suggesting that two notes of $2,500 each be executed with five or more indorsers on each and turned over to plaintiff to raise the money for them, plaintiff's company.

That there was no consideration for this, or the other note, and that he received no credit on his account with plaintiff for this note, or the other, and that being without consideration not owned or held by third parties, and obtained through fraud and deception and for no debt then due, said note is null and void and of no effect.

That had he known that plaintiff corporation intended to collect these notes, or that his friends who are indorsers on these notes were to be called upon to pay plaintiff, he would not have subscribed or executed the notes, secured indorsers, or given the notes to plaintiff; and that consequently there was error of fact which was also pleaded.

That the said note sued on was executed, not for his benefit nor that of the indorsers, but solely to enable plaintiff to borrow money, and that plaintiff corporation was the sole and only beneficiary of the notes so executed; one being the note sued on.

In view of the premises, defendant prayed that there be judgment decreeing the note to be without consideration and obtained through error and fraud and deception, and consequently null and void, and for judgment dismissing this suit with costs, and for equitable and general relief.

The district court rendered judgment adjudging and decreeing that there be judgment in favor of the defendants and against the plaintiff denying and rejecting and dismissing its action for the reasons assigned in its opinion, and that plaintiff pay the costs of suit.

Plaintiff has appealed.

### Opinion.

The plaintiffs appear in court alleging that they are the owners and holders for value of the promissory note described in their petition. They are entitled to the judgment prayed for, unless presumptions arising from that situation are met and overturned and their claim shown to be not well founded. The defendants placed on the stand Alexandre Pellerin, brother of the maker of the note, and asked him whether he had any knowledge of the transaction wherein Joseph Pellerin turned over to Newman the two notes of $2,500 each. He replied that he had. His version of the matter was that Paul Kling, representing H. & C. Newman, called on him at the office of the People's Bank of Breaux Bridge, of which he was the cashier. He said that he had come to get a note from their friends so that they could raise some money; that he told Kling that Joseph Pellerin had already given the firm sufficient security; that Kling replied that those securities could not be used in banks, because they were past due and they wanted new paper. He gave as his reason for wanting new paper that the firm was in a financial panic, and they wanted a note to raise money on. He testified that he thought Kling and himself were alone at the bank when this conversation took place. Being asked, "For whom was this note given to raise money?" witness answered:

"It was given to H. & C. Newman to raise money. It was not given as collateral security for Joseph Pellerin's original indebtedness to that firm. Mr. Kling said that he wanted the notes so that he could raise money on. Kling

did not say that these notes were to be collected by them."

Witness said that the firm was not seeking to raise money for Joseph Pellerin, but for itself. The notes were to be used for themselves. Neither Mr. Harris Hyman nor Mr. Marsh were present at the conversation between himself and Mr. Kling. In giving his version of the transaction with Mr. Kling, witness said:

"One of the indorsers passed the remark to Mr. Kling that he did not want to indorse the notes, because they were liable to be called upon to pay it. Mr. Kling told him not to be afraid; that they would never be called upon to pay it; that they had sufficient collateral from Joseph Pellerin."

Being asked whether Mr. Pellerin had said anything about the liabilities or responsibilities of the indorsers to Mr. Kling, witness said he did not remember. Having his attention called to the statement which he had made that Mr. Kling had told one of the indorsers that he would never be called on to pay the note, he said, "Yes," he said so to one of the indorsers. Witness remembered that distinctly. He did not give the name of the indorser to whom this declaration was made by Mr. Kling. Witness said he was to a certain extent familiar with the business of Mr. Pellerin; that he got money from H. & C. Newman, but he was closely limited. During the panic, Mr. Hyman, of that firm, told him to tell Mr. Pellerin not to draw any more money on it, because the city was in a strike, together with the money panic; that he could not get any more money until further orders.

Witness said that Joseph Pellerin was heavily indebted to the plaintiff firm—his indebtedness was something like $25,000. Joseph Pellerin, the maker of the note sued on, was placed upon the stand. In reference to this note, he testified that Mr. Kling and Alexandre Pellerin called at his home to see him. Mr. Kling wanted him to give him a note of $2,500 and have his friends to indorse

it. Witness said to Kling: "If I cannot pay, how is it going to be?" He replied: "Your friends will never have to pay that." And Alexandre Pellerin said: "You have enough security to guarantee your debt." Neither Mr. Hyman nor Mr. Marsh of the plaintiff firm was present at this interview. Witness went to see his friends. He told them not to be afraid to sign the note for they would never be called on to pay it. Witness told each one of them that they would never be called on to pay the notes because it was understood between Mr. Kling, Alexandre Pellerin, and witness that it was an accommodation note. Witness told the indorsers that it was an accommodation note to Mr. Newman. Witness said that he was not to get any money on the note. The note was executed for the benefit of the plaintiff firm; it was going to use it. After he had given the note to Mr. Kling, he saw Mr. Marsh, one of the members of the plaintiff firm, and spoke to him of Mr. Kling's having gone to see him to sign that note and get his friends to sign it, and Mr. Marsh told him not to worry, that he would never bother his friends about it. Witness after this went with Mr. Alexandre Fournet to New Orleans. They met there Mr. Kling and Mr. Marsh, but not Mr. Hyman. Mr. Fournet told Mr. Marsh that he had gone to see if that note was due by the indorsers. Witness said:

"We understood them to say that they could not say exactly. Mr. Fournet then told them he wanted the note back; that it was made to Mr. Kling; that it was an accommodation note. Mr. Marsh said: 'I cannot give it to you to-day, but we have on the 15th of January a meeting of the board, and we will try and give it back to you.' We asked to see the note. Mr. Marsh said he did not have it; that it was in the bank."

Witness said that he had sent all his cotton to the firm, but they could not give him any more money, so he could not fill in the contract. When witness went to the city to see Mr. Newman, witness did not remember

whether Mr. Marsh said anything about this note and the indorsers, but, the way they spoke to Mr. Fournet, they gave him to understand that the note was not due, but he had to collect it because witness had not sent him cotton enough. Witness did not remember exactly what he said about the indorsers. On cross-examination witness said that he was heavily indebted to the plaintiffs; that he had given them several notes besides that sued on to guarantee the payment of his indebtedness. Witness said that he did not remember whether he had not, in 1908, given the plaintiffs a pledge of the note sued on to guarantee the payment of his indebtedness to the firm. Witness said that Mr. Kling was not present when he signed the note sued on, but the understanding was made between Mr. Kling, Alexandre Pellerin, and himself. Witness had not stated to Mr. Kling, representing the plaintiff firm, that that note was given as a collateral for the amount that he owed the plaintiff company. Being shown the act of pledge filed in evidence, he admitted that the signature thereto was his own. Witness testified that he did not pay anything in 1908 on original indebtedness to the plaintiff firm. Witness stated that Mr. Kling had called to see him generally at the People's Bank of Breaux Bridge, that Alexandre Pellerin told him at that bank, in the presence of Mr. Kling, the understanding which had been reached in reference to the note sued on. Alexandre Pellerin was doing witness' business for him at that time. Witness was indebted to the plaintiff approximately $30,000. The notes he had given to the plaintiffs, including the one sued on, were given by him to guarantee the amount of his indebtedness to the firm. The note sued on was given to it with the understanding he had testified to. Witness had gone with Mr. Fournet to plaintiff's office in New Orleans. He did not remember whether Mr. Fournet had offered at that time to pay his pro rata on the note. He knew Mr. Fournet spoke about it. He thought Mr. Fournet had offered to pay his share, but he told them it was not due by the indorsers, and that if they were to attempt to force the indorsers to pay the note that some of them would go into bankruptcy, as they were poor people. Witness promised Mr. Kling that by the end of 1908 he would do his best to reduce his obligations to the firm to $10,000.

Being asked whether Mr. Kling had not told him that, if he would reduce his account that year $5,000, he would return to him the personal obligation he had against him, witness answered that he told him to try and reduce the account, because he had to return the note; that he could not reduce the account because he had no crop. Being asked a second time the question whether it was not a fact that Kling told him that, if he would reduce his account $5,000 before the end of the year 1908, he would return to him his personal note, witness replied that he did not remember. Witness stated the note sued on was not handed to Mr. Kling by himself, but was sent to the firm by Alexandre Pellerin. Being asked whether, at the time he sent on the note sued on, he had not also sent a pledge, witness answered that he did not remember.

Witness stated that he had promised to send all of his cotton to the plaintiff firm. Being asked whether he had shipped cotton to anybody else, he answered, "Yes," that he had shipped a few bales to Gumbel & Co. for some of his friends.

On redirect examination his counsel asked the following question:

"You stated a while ago on cross-examination that you gave a collateral note including this note to guarantee your indebtedness to plaintiffs. Did you mean the note sued on?"

Witness answered:

"No, sir."

Asked whether he had the permission of the indorsers on the note after he had secured their signatures on the note which was represented to be accommodation note to pledge it, witness replied that he had not.

A. V. Fournet, one of the defendants, as a witness on behalf of the defendants, on being asked to give the circumstances under which he had offered his signature to the note, answered that he had done so on the representation of Mr. Pellerin, who had been dealing with the house of Newman for years. He told witness that he was indebted to them, and in view of the crisis existing at that time they wanted help. He asked witness to sign that note; that it would help those people; that there was no harm to come of it; that we would never be called upon to pay; that he had the assurance of those people; that he believed the representations of Mr. Pellerin and signed the note. Asked if he had anticipated that he would have to pay the note if he would have signed it, he answered:

"I signed it purely as an accommodation note; otherwise I would not have signed it."

Witness testified that, having it called to his attention that the note sued upon was about due, he went to New Orleans with Mr. Joseph Pellerin, the maker, to interview the firm; that they met Mr. Hyman and disclosed the purpose of their visit. He said he would try to arrange it if possible and to return later. They did return, but met only Mr. Kling and Mr. Marsh. Witness asked the latter about the note and told him that he was willing to pay his pro rata, that the condition in his parish was such financially that he was afraid some of the indorsers would not be able to pay. Mr. Marsh said that the note was in bank, that it was deposited with the Whitney Bank as a collateral, that to get the note we would have to pay the money, and he asked witness whether he expected the firm to pay it. Knowing

that the note had been obtained under somewhat dubious condition, the discussion became violent, and witness put the direct question:

"Mr. Marsh, did you, or any one connected with your firm, give the assurance to Mr. Pellerin that, in case he could not pay that note, the firm would not call upon any of the indorsers to do so?"

He said:

"Yes; but since Mr. Pellerin has not complied with his contract to send us his cotton, and he has sent it to other parties, we felt that we had to collect that note."

Witness says he used pretty strong language to him. He finally said:

"We are going to have a meeting of the board on the 15th of January, and we will try and arrange it"

—that he would be (soon) at Breaux Bridge and would let witness know. Witness was willing to pay his share for reasons which he would not be justified to speak of, but that he never thought that plaintiffs were going to force the payment of the note, for they admitted to him that they had told Mr. Pellerin that they would never call on the indorsers to pay it. None of the members of the plaintiff firm were present when witness signed the note. That was all witness knew of the case. His offer to pay his pro rata was before Mr. Marsh admitted that it had been stated to Mr. Pellerin that the indorsers would never be called on to pay. Mr. Kling was present at the conversation in New Orleans, but did not take any part in it. The indorsers did not all sign at the same time.

Martin Voorhies, Laurent Ducrest, Gabriel Fournet, and Louis Potier, defendants in the suit, were placed upon the stand as witnesses for the defense. It appears from their testimony that they signed the note sued on without any communication with the plaintiff firm or any one representing it, and entirely upon representations made to them by

the maker that they would never be called on to pay the note.

The first-named witness said that Mr. Pellerin went to his office and asked him to sign this accommodation note. Witness told him he was willing to accommodate his friends. Pellerin handed him the note. When he saw it was for $2,500, he told Pellerin that it was a large note for him. That Pellerin said that he need not be afraid to sign it, as he would never be called on to pay it. He said that it was a note he was making for his merchants on account of the scarcity of money; that he was heavily indebted to them, and he wanted that note only to raise money for the present, but that he would never be called on to pay that note, and he (witness) signed it. He said that Pellerin stated that it was for his merchants, but did not mention who they were. That he believed Pellerin, and otherwise would not have signed it. The only thing witness knew were the representations made to him by Pellerin.

Ducrest's testimony was substantially to the same effect. He said he signed on the representations of Pellerin that he would never be called on to pay. He said that it was an accommodation note, not exactly an accommodation note, but for prime (time) that these people wanted to get money from the bank, and with the note it would be easy for them to do so. He told witness that it was for his merchants, but witness did not know who they were.

Witness said that he believed what Pellerin told him; that, if he thought this note might be collected from him, he would not have signed it. He said he would not have signed the note for H. & C. Newman. It was on Pellerin's account he signed—in order to help him. Witness had not authorized Pellerin to pledge the note.

Louis Potier's testimony was substantially the same. He stated that he would not have signed the note for H. & C. Newman. He signed only to accommodate Pellerin.

Paul Kling was examined as a witness for plaintiff under a commission. He testified: That he was the traveling creditman of H. & C. Newman; that, as such, it was his duty to examine credits and adjust accounts; that the note sued on was furnished as additional collateral by Joseph Pellerin and pledged to secure notes due to H. & C. Newman; that his indebtedness then amounted to approximately $33,000; that at the date of the note the financial condition of the plaintiff was most excellent; that it had on hand such a surplus of money that it anticipated a large amount of its paper that would have matured at a later date; that this note was positively no accommodation paper, but was pledged with H. & C. Newman with another of like amount due April 1, 1909, in consideration of the firm's extending Joseph Pellerin more time upon his indebtedness, and, had he not done so, plaintiff would immediately have instituted suit to collect the indebtedness and would have foreclosed the mortgages which it held; that he had met Mr. A. V. Fournet on several occasions, but only once was this note discussed, and that was a few weeks before the time when he was giving his testimony, when he called on the plaintiffs with a view of having them accept one-seventh of the amount of the note, releasing him from further liability, which plaintiffs declined to do. Mr. Fournet stated that the indorsers would likely go into bankruptcy to avoid payment. Witness declared absolutely that he made no representation to any of the indorsers, nor did he make any representations of any kind to Mr. Pellerin, except that he told him, whenever he paid $5,000 on account of his indebtedness without withdrawing any of his collateral, the firm would return its note to him with another like amount. Witness testified that he called on Joseph Pel-

lerin about November, 1907, and stated to him that, unless he furnished plaintiffs additional security for his indebtedness, it would foreclose the mortgages which it held, as it could use the money to much better advantage than to have it tied up in an unsatisfactory account. Pellerin told the witness that the only collateral he could furnish was indorsements of his friends. Witness told him that, if he would furnish plaintiffs with good indorsements to the extent of $5,000, the plaintiff would furnish him further time upon his indebtedness. He accepted the proposition and two days later handed witness two notes of $2,500 each, one of which was Exhibit A to his testimony. Witness had never discussed this matter with any of the indorsers except A. V. Fournet, as above referred to in his answer to the interrogatories propounded to him. Joseph Pellerin had never paid or reduced any of this indebtedness to the plaintiffs.

Harris Hyman testified: That he was president of the plaintiff corporation. That the note sued on was furnished to the plaintiff as additional collateral security and to procure from the plaintiffs a further extension on the indebtedness of Joseph Pellerin, as there was at that time due the firm a considerable amount, which it was unwilling to carry. That on November 15th, before and since that time, the plaintiffs were and had been in excellent financial credit. That, in fact, they had more money than was really necessary for the conduct of their business. That the note was not an accommodation paper, but was given as additional collateral security to the indebtedness then existing as to Joseph Pellerin, because the lands had depreciated in value since plaintiff had taken the original security. That he merely met Mr. Fournet at the office and exchanged some courtesies of the day without referring to this matter. That there were no representations made to any one in connection with this matter or any other matter, nor at that time or any other time. That no promises were made to defendants or to any one of them for the purpose of obtaining the note sued on. He testified that plaintiff had never obtained any money on the note, nor did it use it as collateral, retaining it in their portfolio. That plaintiff had requested the Whitney Central Bank to forward the note for collection. That the plaintiff's efforts to collect this note were prompted by the reason that the note was past due and unpaid, and plaintiff believed it collectible, as it regarded the indorsers as solvent men. That he had had no conversation with those gentlemen relative to this matter.

D. H. Marsh under commission testified that he was the vice president and treasurer of the plaintiff firm and was in constant touch with its affairs. He testified, as had Kling and Hyman, that the note was furnished to the plaintiff as an additional collateral security and to procure from it a further extension of time on the indebtedness of Joseph Pellerin, as there was at that time a considerable indebtedness due to it that it was unwilling to continue to carry. He testified, as had Hyman and Kling, to the financial condition of the plaintiff prior to, at, and after the date of the note sued on. That the note sued on was not accommodation paper, but was deposited with the plaintiff's additional security against the indebtedness of Joseph Pellerin. That A. V. Fournet, one of the indorsers, had called on the plaintiff a few weeks before proposing to pay his pro rata of the note if it would release him as indorser thereon, which it refused to do. That no misrepresentations of any character had been made by him to Joseph Pellerin or any of the indorsers on the note sued on in any manner, shape, or form. That no promises were made by the plaintiff to defendants or any one of them for the purpose of obtaining the note sued on. On cross-examination he testified

that the note had never left the possession of the plaintiff; that the Whitney Central National Bank forwarded this note to the Bank of Breaux Bridge for collection for the account of the plaintiff; that it was endeavoring to collect this note as it was a part of the security which it held against the indebtedness of Joseph Pellerin; that plaintiff had never agreed to return this note to the defendants.

The plaintiff filed in evidence the following instrument:

"Breaux Bridge, Nov. 2, 1907.

"Messrs. H. & C. Newman, New Orleans, Louisiana.

"Gentlemen:—I hereby pledge and deliver to you the following described collateral to secure you any amount I may owe you, up to fifty thousand no/100 dollars, whether on note, bills, orders, drafts, open account or otherwise, viz.:

"One note of $2,500.00 dated Nov. 18th, 1907, due April 1st, 1909, signed and indorsed by me in blank bearing 8 per cent. interest from date and further indorsed by Alex. Pellerin, J. Rousseau, D. J. Gragnon, D. Rees, Ursin Broussard, Leed Angelle, Numa Patin, Aston Patin, A. Steen.

"One note of $2,500.00 dated 18th, 1907, due January 1st, 1909, signed and indorsed by me in blank bearing 6 per cent. interest from date and further indorsed by Martin J. Voorhies, A. V. Fournet, Victor Maraist, G. P. Fournet, Louis Potier, J. Laurent Ducrest, H. J. Perriou, and in case I fail to pay all, or any part of my indebtedness to you up to said amount of fifty thousand no/100 dollars, when the same shall become due, in whole or in part, I expressly consent that you shall sell at public or private sale and without any recourse to judicial proceedings of any kind, all of said described collateral, or so much thereof as may be required to pay such of my indebtedness as has matured and at such sale, you may yourselves purchase said collateral.

"This pledge is to be a continuing pledge and shall secure at all times my indebtedness to you up to said amount, however and whenever said indebtedness shall have been incurred and whether on original loans or advances or on extensions or renewals, I waive protest and notice of protest on all said collateral on which I may be the indorser.

"Yours truly,    [Signed]    Joseph Pellerin.

"Rd and filed Feb. 26/09.

"[Signed]    Geo. S. Eastin, Dy. Clerk."

It is very clearly shown that the names of the indorsers upon the note sued on were signed thereon by these parties prior to any communication with the plaintiff, its officers, or any of its agents; that they became indorsers purely upon the representations made to them by the maker, Joseph Pellerin; and that they signed as indorsers purely to assist and help the maker, and not to assist or help the plaintiff. Several of the defendants so declare expressly. They testify that they would have refused to sign the note as indorsers had they been requested to do so by H. & C. Newman. The defendants were friends and neighbors of the maker, while the plaintiff firm was a stranger to them and had no claim upon their friendship as Pellerin did. Defendants very incautiously placed in the hands of Joseph Pellerin a negotiable instrument with the right presumptively by reason of that fact to bind them to the contract evidenced thereby.

Joseph Pellerin, the maker of the note sued on, was indebted in a very large amount to the plaintiff firm, payment of which indebtedness was secured by mortgage. The panic of 1907 came on, and the defendant found himself about to be dispossessed of his property by foreclosure of the mortgage, as his indebtedness was maturing. The plaintiff believed that the mortgage security had become impaired, and it was unwilling that matters should remain in that condition. It notified its debtor that through its traveling creditman, Mr. Kling, it would foreclose its mortgage unless he furnished additional security to the extent which it deemed necessary to save them harmless from the impairment of the original security. It was arranged between the plaintiff, acting through Kling and Joseph Pellerin, that the latter should furnish to the plaintiff additional collateral security for his indebtedness to the amount of $5,000 to be represented by two promissory notes of $2,500 each to be executed by Pellerin to his own order and indorsed by friends of his, whereby they should promise to pay such notes in solido or according to these

H. & C. NEWMAN v. PELLERIN.

terms. The note sued on is one of two notes furnished by Pellerin under that agreement. It would appear that Kling in his conversation and negotiations with Pellerin told him that, whenever he paid $5,000 on account of his indebtedness without withdrawing any of his collateral, the plaintiff would return to him this note with another of like amount. Pellerin at once sought out friends of his, and solicited their assistance in the premises. He succeeded in obtaining the two notes which were required, and doubtless relying himself upon his ability to reduce the indebtedness by the amount stated, and of his doing so in fact, he confidently announced to his friends that they would have nothing to fear from any responsibility resulting to themselves from their indorsement of the notes; that this was so understood between him and the plaintiff.

He was not justified in making this declaration. He evidently failed to inform his indorsers of what the situation would be if he should fail to reduce his indebtedness by the sum stated. The condition upon which alone the note was to be returned was obviously not brought to their knowledge. Pellerin has not reduced, so far as this record shows, his indebtedness as he had expected to do, and, as the result of that failure, came the present litigation.

The plaintiff could not be prejudiced in its right by any assurance given by defendant to the indorsers of their absolute nonliability to it upon their indorsement upon the note. The books are filled with cases where friends have been held upon their indorsement in spite of such assurances given them by the party for whom they became surety. Men are slow to learn prudence by the light of the lamp of experience of others. But while the indorsers in this case are not entitled to invoke in their favor assurances given to them by Pellerin which were unauthorized to be given by the plaintiff, they are entitled to claim the benefit of any limitation upon their liability agreed to by the plaintiff or its agent prior to or at the time of the execution of the note sued on. In this case Kling promised Pellerin on behalf of the plaintiff that the firm would return to him the note which was to be furnished by him under the arrangement which was entered into with respect to the additional collateral security which he was called upon to furnish upon the happening of a certain condition of affairs. The burden was upon the indorsers to establish the existence of the state of facts on which the note sued on was to be surrendered. They have not attempted to do this, nor even urge that such a state of facts can be shown. The particular time which the $5,-000 referred to by Kling was to be paid was not mentioned, but it is fair to be presumed that this payment was to be made at or before the maturity of the note sued on. We are not able to afford relief to the indorsers under the circumstances disclosed by the record. The judgment appealed from is erroneous, and this court is compelled to reverse it.

For the reasons assigned, it is hereby ordered, adjudged, and decreed that the judgment appealed from be, and the same is hereby, annulled, avoided, and reversed, and it is hereby ordered, adjudged, and decreed that the plaintiff, H. & C. Newman, Limited, to have and recover judgment from the defendants Joseph Pellerin, Martin J. Voorhies, Alexandre V. Fournet, Victor Maraist, Gabriel Fournet, Louis Potier, J. Laurent Ducrest, and Horter J. Perriou in solido in the sum of $2,500, with 8 per cent. interest yearly thereon from November 18, 1907, until paid, plus 10 per cent. on tne aggregate amount of said principal and interest as attorney's fees and costs of both courts.